# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division

UNITED STATES OF AMERICA,

vs.                                             CR 212-001

RODERICK BURROWS.

## ORDER

Presently before the Court is a Motion to Suppress filed by Defendant Roderick Burrows ("Burrows"). Dkt. No. 21. For the reasons stated below, Burrows's motion is **DENIED** in part and **GRANTED** in part.

## BACKGROUND

Three days before Thanksgiving, on November 21, 2011, Officer William Wollard ("Officer Wollard") and Sergeant Cedric Brown ("Sergeant Brown") were patrolling Interstate 95 near Savannah, Georgia. Dkt. No. 44, 6:8-14. That morning, around 7:50 a.m., Officer Wollard observed a white Chrysler Town & Country minivan "weaving in and out of . . . lanes" without "changing lanes or giving a signal." Dkt. No. 44, 9:6-7, 13:5-

1

6. Officer Wollard turned on his "blue lights" in order to pull over the vehicle. Dkt. No. 44, 8:2-3. Turning on his "blue lights" activated the video camera attached to the dashboard of Officer Wollard's patrol car, and the video camera began filming. Dkt. No. 44, 8:13-15.

Officer Wollard approached the minivan and asked the driver, Burrows, to produce his driver's license and registration. Dkt. No. 44, 9:21-23. Burrows replied that the car was a rental vehicle and that he did not have the rental agreement with him. Dkt. No. 44, 9:21-23. While talking with Burrows, Officer Wollard "noticed [Burrows] was extremely nervous" and that he "would avoid eye contact." Dkt. No. 44, 11:19-21. Officer Wollard testified that Burrows's hands were "visibly shaking." Dkt. No. 44, 11:18-19.[1] While Officer Wollard stated that "[e]verybody is a little bit nervous when you pull them . . . over," Officer Wollard found that Burrows's nerves went beyond what was normal. Dkt. No. 44, 12:4-6.

When asked about his travel plans, Burrows stated that he was coming from North Carolina, but he was headed to St.

---

[1] As noted in the Magistrate Judge's Report and Recommendation, the hand shaking is not visible on the DVD recording of the stop. See Dkt. No. 49, 8. However, some of the hand shaking occurred before Burrows exited the vehicle and first came into view on the DVD. Dkt. No. 44, 42:4-9. Also, Officer Wollard testified that the shaking was not apparent from the DVD because of its lower resolution, but he was able to see it while standing only about a foot and half away. Dkt. No. 44, 29:3-5, 42:15-20.

2

Augustine, Florida to play poker. Dkt. No. 44, 12:21-22.
Because weaving can be a symptom of exhaustion, Officer Wollard
asked Burrows where he had stayed the night before. Dkt. No.
44, 12:23-25, 13:1. Burrows replied that he had slept at a
Hilton hotel "a couple hours up the road," but Burrows could not
give "a location, an exit" or any other description of the
hotel's whereabouts. Dkt. No. 44, 13:1-4. Burrows also told
Officer Wollard that, a few nights beforehand, he had
"accidently ended up in Atlanta, Georgia and [had] decided[,]
since he was there[, to stay] a couple of nights with a friend."
Dkt. No. 44, 13:15-17. Burrows could not recall the friend's
last name, despite the fact that he had known him for several
years. Gov't Ex. 1, 6:30.

Officer Wollard then told Burrows that he was only going to
give him a warning. Dkt. No. 44, 14:3-12. In Officer Wollard's
experience, most people will calm down and "stop their shaking
and nervousness" when they find out that they will just receive
a warning. Dkt. No. 44, 14:3-17. Burrows, however, remained
nervous. Dkt. No. 44, 14:3-17.

About ten minutes into the traffic stop, while Officer
Wollard "was filling out the warning citation," he asked Burrows
for consent to search his vehicle. Dkt. No. 44, 16:14-18.
Burrows refused. Dkt. No. 44, 16:14-18. Officer Wollard then

AO 72A
(Rev. 8/82)

gestured for his partner, Sergeant Brown, who had pulled up behind Officer Wollard's vehicle halfway through the stop, to bring out his dog, Chacal, to perform a free air sniff of the vehicle. Dkt. No. 44, 15:13-15. It was regular practice for Officer Wollard to use Sergeant Brown's dog on a stop and vice versa, so that the officer conducting the traffic stop was "not associated with the dog." Dkt. No. 44, 58:15-21.

After sniffing around the vehicle, Chacal alerted. Dkt. No. 44, 17:1-6. Burrows contests whether Chacal actually did alert, see Dkt. No. 21, however the DVD clearly shows Chacal sitting back and barking, which fits Sergeant Brown's description of Chacal's "passive alert." Dkt. No. 44, 53:6-8. Based on the time displayed on the DVD, this alert occurred approximately twelve minutes into the traffic stop.

The DVD itself does not clearly show whether Officer Wollard continued to fill out the citation form the entire time Chacal walked around the vehicle. On the DVD, Officer Wollard returns to his car and moves out of view shortly after Sergeant Brown brings Chacal to the car. Gov't Ex. 1, 11:16. Officer Wollard, however, testified that "he continued to fill out the warning" while Sergeant Brown "r[an] his dog around the vehicle." Dkt. No. 44, 16:14-18. Because there is no evidence contradicting Officer Wollard's statement, this Court finds that

4

the dog sniff occurred while Officer Wollard completed the citation and, therefore, did not prolong the stop.

Once Chacal alerted, Officer Wollard and Sergeant Brown searched the minivan. Dkt. No. 44, 17:7-8. In the vehicle, they found fraudulent driver's licenses, multiple credit cards, a laptop, and a reader-writer scanner.[2] Dkt. No. 44, 17:9-25. The Government later charged Burrows with: possession of false identification documents, possession of unauthorized access devices, possession of access device-making equipment, and aggravated identity theft. See Dkt. No. 1. Burrows filed a motion to suppress seeking to exclude all of the evidence obtained as a result of the November 21, 2011 traffic stop. See Dkt. No. 21.

## DISCUSSION

Burrows makes several Fourth Amendment challenges to the traffic stop and the resulting search and seizure of his laptop. This Court deals with Burrows's various arguments chronologically.

---

[2] A reader-writer scanner can reprogram the magnetic strip on a credit card in order to input new account information. Dkt. No. 44, 69:20-25, 70:3-9. Through this process, an individual can reprogram existing cards with new credit card numbers purchased from the internet. Dkt. No. 44, 70:5-9.

AO 72A
(Rev. 8/82)

## I. Probable Cause for a Traffic Violation

Burrows argues that he should not have been pulled over in the first place because Officer Wollard lacked probable cause to believe that a traffic violation occurred. To support this contention, Burrows argues that the DVD merely shows the minivan weaving within a single lane, which is not a violation of Georgia law. See Dkt. No. 21, 8 (citing State v. Hanson, 532 S.E.2d 715, 721 (Ga. Ct. App. 2000)).

Burrows's argument, however, confuses the sequence of events. The video camera attached to Officer Wollard's vehicle did not begin recording until the blue lights were activated. Dkt. No. 44., 8:15-21. Accordingly, Officer Wollard first observed the minivan weaving in and out of different lanes. Then, Officer Wollard activated his blue lights, at which point the video camera began recording. So, as Officer Wollard testified "the violation may not have been . . . recorded." Dkt. No. 44, 8:16-21. Thus, Burrows's argument, which is based solely on the DVD, is unpersuasive. Officer Wollard did have probable cause that Burrows had committed a traffic violation and the initial seizure was valid.

## II. Length of the Traffic Stop

Burrows contends that Officer Wollard unduly prolonged the traffic stop because he failed to issue a warning citation

6

within a reasonable time.  See Dkt. No. 21.  According to

Burrows, Officer Wollard postponed writing the citation so that

he could go on a "fishing expedition" and "incessant[ly]

question Burrows on matters unrelated to the traffic stop."

Dkt. No. 21.

As an initial matter, in terms of length alone, the traffic

stop was reasonable.  By the time Chacal alerted, only about

twelve minutes had passed since Officer Wollard first observed

the minivan weaving.  The Eleventh Circuit has held that a

"detention of fourteen minutes is certainly not unreasonable on

its face."  United States v. Purcell, 236 F.3d 1274, 1277 (11th

Cir. 2001).  A detention of twelve minutes, therefore, is also

not unreasonable on its face.

Furthermore, Officer Wollard's conversation with Burrows

did not unreasonably lengthen the stop.  Contrary to Burrows's

contentions, the questions about Burrows's travels did, in fact,

relate to the traffic violation.  Officer Wollard testified that

"when somebody has been weaving," it is important to "rule out"

potential causes, such as lack of sleep.  Dkt. No. 44, 12:24-25,

13:1-2.  Where Burrows was heading from, where he was heading

to, and where he had slept were all relevant to whether Burrows

was too exhausted to drive safely.

AO 72A
(Rev. 8/82)

The questions Officer Wollard asked that were unrelated to the traffic violation were also permissible. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States v. Griffin, No. 11-15558, 2012 WL 4496817 at *4 (11th Cir. Oct. 2, 2012) (adopting the view "that unrelated questions posed during a valid Terry stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop'"). Here, Officer Wollard asked Burrows about things like his abilities as a card player and whether he went shopping in Atlanta, which were clearly not relevant to the traffic violation.

Although the standard articulated in Johnson and Griffin uses the term "measurabl[e]," that term is meant in the sense of whether the delay qualifies as "significant" or "great enough to be worth consideration," rather than whether the amount of time is merely capable of measurement. United States v. Everett, 601 F.3d 484, 491 (6th Cir. 2010). "In this age, when even cheap wristwatches accurately mark off time in milliseconds, there is

AO 72A
(Rev. 8/82)

no doubt that [any] question [takes] up a quantum of time large enough to be measured." Id.

Here, Officer Wollard's questions extended the stop only briefly. Courts have found similarly brief extensions to be permissible under the Fourth Amendment. See Griffin, 2012 WL 4496817, at *5 (holding that an extension lasting approximately thirty seconds did not qualify as measurable); United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010) (questions about travel plans, which were unrelated to reason for traffic stop, and which took an additional one to two minutes, did not unreasonably lengthen the stop); Everett, 601 F.3d at 495-96 (concluding that unrelated questions during a traffic stop, which took several seconds, were permissible). Accordingly, Officer Wollard's brief questioning on matters unrelated to the traffic violation, which took only a minute or so, did not unreasonably prolong the stop in violation of the Fourth Amendment.

## III. Legitimacy of the Dog Sniff

In support of his motion to suppress, Burrows contends that the dog sniff violated his Fourth Amendment rights because Officer Wollard lacked reasonable suspicion. See Dkt. No. 21. However, in light of this Court's finding that Sergeant Brown and Chacal conducted the drug sniff while Officer Wollard

AO 72A
(Rev. 8/82)

continued filling out the warning citation form, no reasonable suspicion was necessary to justify the sniff.

Under well-established law, because a dog sniff can only reveal the presence of narcotics, a dog sniff "during a lawful traffic stop, generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409 (2005); see also United States v. Place, 462 U.S. 696, 707 (1983). As long as a dog sniff occurs during an otherwise lawful seizure, no level of suspicion is necessary to justify the sniff. Therefore, because the dog sniff here occurred contemporaneously with Officer Wollard finishing the warning citation, the dog sniff did not implicate Fourth Amendment interests.

Furthermore, even if Officer Wollard had finished the warning citation before Chacal alerted, the seizure would still be justified under Fourth Amendment Terry principles. See generally Terry v. Ohio, 392 U.S. 1 (1968). To prolong a traffic stop "longer than necessary to process the traffic violation," an officer needs reasonable and articulable suspicion of other illegal activity. See United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (citing United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)). "The validity of the stop must be considered in view of the totality of the circumstances." United States v. Lee, 68 F.3d 1267, 1271

AO 72A
(Rev. 8/82)

(11th Cir. 1995). "None of the suspect's actions need be criminal on their face, yet taken together, they can provide trained police with reasonable suspicion." Id.

Officer Wollard had reasonable suspicion of illegal activity to justify a dog sniff based on (1) Burrows's nervousness, (2) his bizarre travel course, and (3) the lack of a rental agreement.[3] Officer Wollard testified that Burrows was "extremely nervous" and that his hands were "visibly shaking." See Dkt. No. 44, 11:18-25. As the DVD demonstrates, Burrows did not maintain eye contact with Officer Wollard. Burrows's description of his travels was suspicious in that he "accidently" ended up in Atlanta and stayed several days with a friend; he could only remember the first name of his friend despite knowing him for several years; and Burrows did not remember anything about the hotel he had just left a few hours ago apart from the fact that it was a Hilton. While on an

---

[3] During the hearing, the Assistant United States Attorney ("AUSA") asked Officer Wollard why he had asked Burrows for consent to search the van. Dkt. No. 44, 14:25. Officer Wollard stated this was based on Burrrow's answers and his nervousness. Dkt. No. 44, 15:3. The AUSA then asked, "And the lack of the rental agreement?". Dkt. No. 44, 15:4. Burrows's attorney objected to this question as leading, and the magistrate judge sustained that objection. Dkt. No. 44, 15:7-8. The AUSA did not then rephrase her question. However, reasonable suspicion is an objective standard. See United States v. Arvizu, 534 U.S. 266, 273 (2002). So, even though there was no testimony that Officer Wollard based his own actions on the lack of a rental agreement, that testimony was not necessary. Officer Wollard referenced Burrows's lack of a rental agreement other times in the hearing without objection. See Dkt No. 44, 9:21-23.

AO 72A
(Rev. 8/82)

individual basis each of these things may not be suspicious, the totality of the circumstances supports Officer Wollard's reasonable suspicion that criminal activity beyond Burrows's failure to maintain his lane was afoot.

In sum, reasonable suspicion was not necessary in light of this Court's finding that the dog sniff did not prolong the stop. However, even if the sniff had prolonged the stop, Officer Wollard would have had a reasonable and articulable suspicion sufficient to justify the brief detention.

## IV. Relationship Between Burrows Refusing Consent to Search and the Dog Sniff

Burrows also attacks the dog sniff by claiming that Officer Wollard unconstitutionally retaliated against Burrows for refusing to consent to a search. See Dkt. No. 51. Burrows harps on the fact that Officer Wollard first asked Burrows for consent to search the minivan, Burrows refused, and then Officer Wollard gestured for Sergeant Brown to perform a dog sniff.

Burrows relies on Boyce for support, however, that reliance is misplaced. 351 F.3d at 1110. In Boyce, the court held that "[t]he police cannot base their decision to *prolong* a traffic stop on the detainee's refusal to consent to a search." Id. (emphasis added). Here, calling Chacal did not prolong the stop; the dog sniff occurred contemporaneously with the completion of the warning citation. The mere fact that Officer

12

Wollard asked Burrows for consent to search the vehicle before calling a drug dog does not, by itself, establish that Officer Wollard did so to retaliate against Burrows exercising his constitutional rights.

## V. Reliability and Training of Chacal

Burrows further argues that the evidence obtained from the minivan should be suppressed because Chacal's alert did not supply probable cause. See Dkt. No. 21. According to Burrows, Chacal was poorly trained and unreliable. However, neither the existing case law, nor the record support that argument.

Under well-established law, an alert of a trained narcotics-detection dog provides probable cause to search. See Hearn v. Bd. of Pub. Educ., 191 F.3d 1329, 1333 (11th Cir. 1999) ("[T]he alerting of a drug-sniffing dog to a person's property supplies not only reasonable suspicion, but probable cause to search that property."); United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) ("[P]robable cause arises when a drug-trained canine alerts to drugs."). As for the necessary training, the Eleventh Circuit has stated that "training of a dog alone is sufficient proof of reliability." United States v. Sentovich, 677 F.3d 834, 838 n.8 (11th Cir. 1982).

Here, Chacal had extensive training. Chacal attended and successfully passed a certification course at the North American

AO 72A
(Rev. 8/82)

Police Work Dog Association. Dkt. No. 44, 47:14-18. Chacal earned his certification in both narcotics detection and police utility, which includes handler protection, drug detection, and officer safety. Dkt. No. 44, 48:5-16. Sergeant Brown, who led Chacal through the certification process, had fifteen years of experience working with drug dogs and had worked with four other dogs before Chacal. Dkt. No. 44, 47:2-6.

Apart from his initial training at the North American Police Work Dog Association, Chacal also participated in twice monthly departmental training where a training officer would hide certain amounts of drugs to ensure that the dogs were "still accurate in their training and [could] find the drugs that they [were] supposed to." Dkt. No. 44, 49:5-14. At these departmental training sessions, Sergeant Brown and the other dog handlers would not know where any of the drugs were hidden, only the training officer would. Dkt. No. 44, 49:19-25. To further fine tune Chacal's skills, Sergeant Brown, each day, would do a "hide" with Chacal during any down time he had while out on patrol. Dkt. No. 44, 51:7-11.

Burrows attacks Chacal's reliability and training by portraying Chacal as an unruly and poorly trained beast who alerts at the drop of a hat. See Dkt. No. 51. Burrows points to the fact that Sergeant Brown could not produce any training

AO 72A
(Rev. 8/82)

logs because Chacal ate half of Sergeant Brown's notes.  Dkt. No. 44, 52:16-25.  While the training log incident indicates that Chacal may not make a good house pet, it says little about his abilities in narcotics detection.  The evidence presented at the hearing regarding Chacal's certification and other training is far more on point.  That evidence demonstrated that Chacal was thoroughly and adequately trained.

Burrows also objects to Chacal's training in residual odors, particularly as applied to rental car drivers.  See Dkt. No. 51.  Burrows is concerned that a dog trained in residual odors can alert on a rental car based on a previous renter's drug use.  See Dkt. No. 51.  That, however, seems to be a risk inherent in operating a rental vehicle.  The parties were unable to point to any relevant case law on this issue, but this situation does not seem that different than when a driver has borrowed a car from a friend.  If the borrowed car contained residual drug odors, the fact that the driver was not the primary user of the car would not, on its own, strip a police officer of probable cause.  Here, basically the same thing occurred except Burrows borrowed the car from Enterprise Rent-A-Car rather than a friend.  See Dkt. No. 44, 72:7.  Accordingly, Chacal's alert to what may have been a prior user's drug residue did not violate the Fourth Amendment.

15

## V. Incriminating Statements

Burrows seeks the suppression of statements he made while handcuffed and without the benefit of Miranda warnings. See Miranda v. Arizona, 384 U.S. 436 (1966). "[T]he prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards[4] effective to secure the privilege against self-incrimination." Id. at 444. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." Id.

The Government concedes that Burrows was under arrest when the officers asked questions relating to the fake driver's licenses found during the search of the van. See Dkt. No. 22. The Government also concedes that this questioning was done without the benefit of Miranda warnings, and any statements Burrows made as a result should be suppressed. This Court agrees and grants that portion of Burrows's motion. Any

---

[4] "Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

AO 72A
(Rev. 8/82)

statements Burrows made after he was handcuffed and arrested should not be used against him during the trial of this case.[5]

## VI. Unreasonable Delay in Obtaining a Search Warrant

Burrows also argues that the seventeen day delay between the seizure of his laptop computer and the issuance of the search warrant violated his Fourth Amendment rights. See Dkt. No. 21. "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonable infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable searches." United States v. Mitchell, 565 F.3d 1347, 1350 (11th Cir. 2009) (quoting United States v. Jacobsen, 466 U.S. 109, 124 (1984)). The reasonableness of the delay is determined "in light of all the facts and circumstances and on a case-by-case basis." Mitchell, 565 F.3d at 1351 (citations omitted). "[T]he reasonableness determination . . . reflect[s] a 'careful balancing of governmental and private interests.'" Id. (citing Soldal v. Cook County, 506 U.S. 56, 71 (1992)).

Applying that standard here, this Court holds that the Government had a "compelling justification" for the delay.

---

[5] The Government contends that Burrows's statements, while legally involuntary, were not physically involuntary. Thus, the Government argues that these statements may be used against Burrows as impeachment evidence should Burrows testify. This Court offers no opinion as to the Government's assertion.

AO 72A
(Rev. 8/82)

Mitchell, 565 F.3d at 1351. Numerous obstacles stood in the Government's path. The traffic stop occurred just three days before Thanksgiving, a widely-celebrated holiday. Special Agent Will Griffin was the only Secret Service Agent in the Savannah office that week. Dkt. No. 44, 75:4-13. In spite of that, Agent Griffin, who had possession of the computer, was able to submit an affidavit to the United States Attorney's Office the following Thursday. Dkt. No. 44, 77:13. Agent Griffin testified that during that "holiday week," he did "as much as [he] could" and, once he "had all[his] facts together," he submitted the affidavit. Dkt. No. 44, 76:12-13, 77:11-12.

Agent Griffin then scheduled an appointment with Magistrate Judge Smith for the following Monday for him to sign the warrant. Dkt. No. 44, 77:11-17. However, the appointment was later rescheduled for December 8th, that Thursday. Dkt. No. 44, 77:11-17. At that meeting, Judge Smith was able to sign the warrant. Dkt. No. 44, 77:16-17.

During this time frame, Agent Griffin had to juggle other substantial duties. Not only did he have other cases he was assigned to investigate, but he also had to fill in as office supervisor. Dkt. No. 44, 78:5-13. The former office supervisor had retired, "and due to budget constraints," Agent Griffin and another agent "were rotating off as the supervisor of the

18

office, as well as conducting [their] own work." Dkt. No. 44, 78:5-13.

This case is distinguishable from Mitchell, where the Eleventh Circuit held that a three-week delay in seeking a search warrant for a computer hard drive was unreasonable under the circumstances. 565 F.3d at 1352. The agent in Mitchell attended a two-week training program, which he may have been able to delay, and testified that he postponed applying for a warrant because he "felt there was no need to get a search warrant . . .until [he] returned." Id. at 1351. The agent in Mitchell also failed to ask another agent who was familiar with the case and had similar qualifications for assistance while he was away at the training program. Id. at 1352. Essentially, the delay in Mitchell stemmed from the law enforcement officer's "belie[f] that there was no rush" because the defendant had admitted there was contraband on the hard drive. Id. at 1353.

The present case, however, does not involve a situation where law enforcement delayed because they "simply believed that there was no rush." Id. Rather, law enforcement in this case earnestly and diligently worked towards obtaining the search warrant as soon as practicable, but there were various obstacles in the way. See United States v. Whaley, 415 F. App'x 129, 135-36 (11th Cir. 2011) (concluding that a "significant[]" delay was

reasonable in part due to the strained Secret Service resources while the agency provided security detail for all candidates in the 2008 presidential election); United States v. Vallimont, 378 F. App'x 972, 976 (11th Cir. 2010) (holding that a forty-five-day delay in obtaining a search warrant was reasonable when the officer engaged in efforts to secure the warrant and continued investigating the case).

To support his argument that the delay was unreasonable, Burrows points to the fact that the last date included in the search warrant affidavit was November 22nd, the day after the traffic stop. Dkt. No. 51. However, not every item in the affidavit was dated and Agent Griffin testified that, up until the December 8th appointment with Judge Smith, Agent Griffin was working to obtain additional information. Dkt. No. 44, 77:18-25, 78:1-4, 81:14-24. Given the circumstances, the timing and other restraints law enforcement faced constituted a compelling justification for the delay and the delay was reasonable under the Fourth Amendment.

### CONCLUSION

Apart from the incriminating statements made in violation of Miranda, the Government is entitled to use all other evidence obtained during the November 21, 2011 traffic stop.

AO 72A
(Rev. 8/82)

Accordingly, Burrows's Motion to Suppress, Dkt. No. 21, is **DENIED** in part and **GRANTED** in part.

**SO ORDERED**, this 11th day of October, 2012.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)